

FILED & ENTERED

JUL 10 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Paul William Martin, Debtor | Case No.:    2:17-bk-16996-ER<br>Adv. No.:    2:17-ap-01587-ER |
| Kevin Hunter,<br><br>                                   Plaintiffs<br><br>                    v.<br><br>Paul William Martin DBA Veronica Rose<br>Productions, Inc.,<br><br>                                   Defendant | **MEMORANDUM OF DECISION FINDING THAT MARTIN'S INDEBTEDNESS TO HUNTER, IN THE AMOUNT OF $10,000, IS EXCEPTED FROM DISCHARGE**<br><br>**TRIAL:**<br><br>Date:    January 28 and February 4, 2019<br>Time:    9:00 a.m.<br>Location:    Ctrm. 1568<br>            Roybal Federal Building<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

## I. Introduction

In this dischargeability action, Plaintiff Kevin Hunter ("Hunter") alleges that Defendant Paul William Martin ("Martin") is liable in the amount of $141,582.88 under §§ 523(a)(2)(A), (a)(2)(B), (a)(4) (for committing fraud or defalcation in a fiduciary capacity), and (a)(6). The alleged liability arises from a $50,000 loan that Hunter extended to Martin in 2010. In addition to recovery of the loan's principal, Hunter seeks recovery of interest in the amount of $25,232.88 and attorneys' fees and costs in the amount of $66,350.

Trial was conducted on January 28 and February 4, 2019.[1] The parties filed closing briefs on May 10, 2019.[2] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[3]

For the reasons set forth below, the Court finds that Martin is indebted to Hunter in the amount of $10,000, and that such indebtedness is excepted from Martin's discharge pursuant to § 523(a)(2)(A), on the ground of actual fraud. Hunter is not entitled to judgment on any of his other claims for relief; judgment will be entered in favor of Martin as to those claims.

## II. Facts

Martin was the founder, president, and Chief Executive Officer of Veronica Rose Productions, Inc. ("VRP").[4] VRP was a start-up company attempting to develop a software platform that would help music owners maximize royalty collections.[5]

George Shohet ("Shohet") is a licensed attorney who maintains an office in Venice, California.[6] Shohet and Martin were acquainted because they both lived in the same neighborhood.[7] Martin would occasionally talk to Shohet about his latest business project when he encountered Shohet on the street.[8]

In the summer of 2010, Martin approached Shohet and asked Shohet if he could help VRP raise capital.[9] Shohet agreed to help, and commenced negotiations regarding a potential investment with his friend, Kevin Hunter ("Hunter"). Shohet and Hunter had been friends for close to thirty years, having met at law school.[10] At the time of the negotiations, Hunter worked as a managing director and portfolio manager at NWQ Investment Management.[11]

---

[1] A transcript of the proceedings occurring on January 28, 2019 is available as docket entry 50 and is cited as "Tr. Jan. 28." A transcript of the proceedings occurring on February 4, 2019 is available as docket entry 51 and is cited as "Tr. Feb. 4."

[2] Doc. Nos. 53–54.

[3] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.

[4] Joint Proposed Pre-Trial Stipulation and Order as Modified by the Court [Doc. No. 38] (the "Pretrial Order") at ¶ 14.

[5] Plaintiff's Ex. 2 (investor presentation describing VRP's business).

[6] Pretrial Order at ¶ 15.

[7] Tr. Jan. 28 at 96:1–5 (testimony of Shohet).

[8] *Id.*

[9] Tr. Feb. 4 at 100:12–18 ("I had approached George Shohet seeking financing, not personal loans, and so the plan was, you know, that we get away from these friends and family and get into a more sophisticated investor type who would then be able to introduce us to angels, and—George [Shohet] was, at least at the time, acting as if he was going to be helping us with large capital raises") (testimony of Martin).

[10] Tr. Jan. 28 at 95:23–96:1 (testimony of Shohet).

[11] Tr. Jan. 28 at 44:8–9 (testimony of Hunter).

Shohet was not formally retained as counsel by either Martin or VRP in connection with the negotiations,[12] and received no payments for his work. Shohet became involved because he believed VRP's technology showed promise and he anticipated receiving some form of compensation in the future:

> The technology looked very promising and the fact that there were already two significant contractual relationships with major music industry participants was intriguing…. [A]ssuming commercialization … I might be in a position to, you know, receive compensation or get involved in [an] actual role in, you know, corporate governance of the enterprise.

Tr. Jan. 28 at 134:22–135:17 (testimony of Shohet).

Hunter declined Shohet's initial proposal that Hunter make an equity investment in VRP.[13] Hunter did not have time to perform due diligence on VRP and so was not comfortable making an equity investment.[14] Shohet then proposed that Hunter make a short-term loan secured by VRP stock owned by Martin.[15] Hunter declined this proposal, again because he did not have time to perform due diligence on VRP.[16] Shohet's next pitch was that Hunter extend a short-term loan to Martin personally, to be secured by collateral owned by Martin, with the understanding that the proceeds would be used by VRP. In furtherance of this proposal, Shohet e-mailed Hunter a term sheet on Friday, August 20, 2010 (the "Final Term Sheet").[17] The Final Term Sheet provided for a $50,000 loan from Hunter to Martin, secured by "two Chris Reilly original paintings and a 1996 Porsche 993."[18] Regarding the collateral, the Final Term Sheet stated: "The art work and Porsche are owned free and clear by Mr. Martin. VRP and Mr. Martin represent that the value of the collateral exceeds $50,000."[19]

Shohet prepared the Final Term Sheet using two proposed term sheets that Martin had e-mailed to Shohet the previous day (the "Proposed Term Sheets").[20] Specifically, on August 20, 2010, at 9:19 a.m., Martin sent Shohet an e-mail with the subject line "Stab at term sheets for 50k" (the "August 20th E-mail").[21] The body of the August 20th E-mail provided in its entirety: "George I have taken a stab at this…let me know what you think…" The Proposed Term Sheets were attached to the August 20th E-mail as Microsoft Word documents. One of the Proposed Term Sheets prepared by Martin stated that the value of the collateral exceeded $50,000.[22]

---

[12] Tr. Feb. 4 at 196:21–197:3 (testimony of Martin).

[13] Tr. Jan. 28 at 20:23–21:9 (testimony of Hunter).

[14] Id.

[15] Tr. Jan. 28 at 21:10–16 (testimony of Hunter).

[16] Id.

[17] Plaintiff's Ex. 7.

[18] Id.

[19] Id.

[20] Plaintiff's Ex. 5–6.

[21] Plaintiff's Ex. 5.

[22] The Proposed Term Sheet provided in relevant part: "Collateral is to be issued in the form of Art work held by Paul Martin. They are Chris Reilly originals and have a retail market value of 50k. Mr. Martin will discount the Art work to 25k for both pieces. In addition, Mr. Martin will

Martin denied preparing the Proposed Term Sheets, but his testimony in this respect was not credible. On August 19, 2010, Shohet sent Hunter an e-mail containing three attached documents (the "August 19th E-mail").[23] The attached documents provided an overview of VRP's business plan.[24] Martin was blind carbon copied on the August 19th E-mail. At trial, Martin attempted to exploit a formatting ambiguity to argue that the Proposed Term Sheets were originally sent as attachments to the August 19th E-mail sent by Shohet, and were not attachments to the August 20th E-mail sent by Martin.[25] A careful review of both e-mails shows that Martin's contention is meritless.

The filenames of the three attachments to the August 19th E-mail are "VRP Investor Letter2.5.doc," "VRP competitive analysis v4.doc," and "VRP Overview 7-2010.pdf." Martin sent the August 20th E-mail to Shohet by replying to the August 19th E-mail. As a result, the August 20th E-mail contains the text of the August 19th E-mail. The August 20th E-mail does **not** contain the attachments to the August 19th E-mail—the filenames "VRP Investor Letter2.5.doc," "VRP competitive analysis v4.doc," and "VRP Overview 7-2010.pdf" do not appear in the August 20th E-mail. Instead, the August 20th E-mail contains two new attachments, with the filenames "TS.doc" and "Tsprop.doc." The difference in the filenames shows that the "TS.doc" and "Tsprop.doc" files were attachments to the August 20th E-mail, not attachments to the August 19th E-mail.

Martin admitted at trial that he wrote the August 20th E-mail.[26] Based upon this admission, the text of the August 20th E-mail which clearly indicates that the e-mail is Martin's "stab" at creating term sheets, and the fact that the Proposed Term Sheets were attached to the August 20th E-mail, the Court finds that Martin prepared the Proposed Term Sheets.

On August 26, 2010, at 7:33 a.m., Shohet sent Hunter a draft promissory note, created by Shohet, that was based upon the terms set forth in the Final Term Sheet.[27] At 8:12 a.m. that morning, Shohet sent Martin a revised version of the draft promissory note.[28] Approximately an hour later, at 9:34 a.m., Shohet sent Hunter the final version of the promissory note signed by Martin.[29] At 1:32 p.m. that afternoon, Hunter e-mailed Shohet a fully executed copy of the promissory note (the "Note").[30]

The Note memorialized a $50,000 loan from Hunter to Martin, bearing interest at the rate of 6%. A balloon payment of the principal and unpaid interest was due on September 1, 2011. The Note was secured by the following collateral:

1) 1996 Porsche 993; License No. 5DMX 199; VIN: WPOAA2999TS322286; located in New York, NY (the "Porsche"); and

---

put up a 1996 Porsche 993 with a retail value of 34k discounted to 25k to the investor."
Plaintiff's Ex. 5 at GS082.

[23] Plaintiff's Ex. 1.

[24] The attached documents are Plaintiff's Exhibits 2–4.

[25] Tr. Jan. 28 at 100:17–102:11 (Martin's objection to admission of the August 20th E-mail).

[26] Tr. Feb. 4 at 145:24–146:1.

[27] Tr. Jan. 28 at 111:22–112:24 (testimony of Shohet) and Plaintiff's Ex. 13.

[28] Tr. Jan. 28 at 113:6–22 (testimony of Shohet) and Plaintiff's Ex. 14.

[29] Tr. Jan. 28 at 114:4–115:4 (testimony of Shohet) and Plaintiff's Ex. 15.

[30] Plaintiff's Ex. 16.

2) Two untitled, signed original Chris Reilly art works: (i) painting on white wooden door with red border and two thornless red roses in a gold leaf window; (ii) painting on canvas, "Color of Money" effect with carvings, Japanese maple leaf and a border of silver leaf; located at 34 Ozone Ave. #3, Venice, CA 90291 (both paintings collectively, the "Artwork," and the Artwork and Porsche collectively, the "Collateral").

*See* Note at Ex. A (Plaintiff's Ex. 16).

The Note contained the following provisions regarding the Collateral:

> On and as of the date of this Note, Borrower [Martin] represents and warrants to Lender [Hunter] that Borrower is the true and lawful owner of the Collateral, having good and marketable title thereto, free and clear of any and all Liens other than the Lien and security interest granted to Lender hereunder and Permitted Liens. Borrower shall not create or assume or permit to exist any such Lien on or against any of the Collateral except as created or permitted by this Note and Permitted Liens, and Borrower shall promptly notify Lender of any such other Lien against the Collateral and shall defend the Collateral against, and take all such action as may be necessary to remove or discharge, any such Lien.

Note at ¶ G.

The Note further provided that upon and during the continuance of any event of default, Hunter would have the right to sell all or any part of the Collateral.[31] The Note provided that Hunter had the right, but not the obligation, to convert the Note into shares of VRP common stock.[32] Hunter never made any representation that he would exercise his option to convert the Note into equity in VRP.[33]

Martin used the proceeds of the Note to fund VRP's operations.[34] Martin has not repaid any portion of the Note's principal and has not repaid any portion of the accumulated interest.[35]

In determining whether to loan Martin the funds, Hunter considered various documents describing VRP's business sent to him by Shohet (all such documents collectively, the "VRP Investment Materials").[36] In particular, Hunter relied upon statements in a document titled

---

[31] Pretrial Order at ¶ 26; Note at ¶ J.

[32] Pretrial Order at ¶¶ 26 and 28; Note at ¶ E.

[33] Pretrial Order at ¶ 28.

[34] Tr. Feb. 4 at 198:18–22 (testimony of Martin).

[35] Pretrial Order at ¶ 30.

[36] The VRP Investment Materials consisted of the following documents:
1) A document titled Veronica Rose Productions Partner Overview (the "VRP Overview") (Plaintiff's Ex. 2);
2) A revised version of the Veronica Rose Productions Partner Overview (Plaintiff's Ex. 10);
3) An investor letter, dated August 13, 2010, addressed to "Tom" (Plaintiff's Ex. 3);
4) An investor letter, dated August 16, 2010, addressed to "Amy" (Plaintiff's Ex. 9);
5) A set of financial assumptions and projections (Plaintiff's Ex. 4);
6) A revised set of financial assumptions and projections (Plaintiff's Ex. 11).

*Veronica Rose Productions Partner Overview* (the "VRP Overview").[37] Hunter testified that he focused on the following statements in making the lending decision:

> So I looked to these documents to give me an indication of the time to market and the potential magnitude of revenues to determine having made a loan that was collateralized—would this be a company that I might be interested in converting my loan into stock as stated in the loan document over the next few months as I did my due diligence…. [I looked at] Paragraph 4 on page 3 which indicated that the product was fully prototyped from both the technical and business aspect and that they planned to have the product in market in the fall of 2010. I also focused on the statements that there was the potential of 50 million dollars in gross revenues by 2015.
>
> On page 5, [the] statement that stuck out was "Generate the first $100,000 of gross revenue in the second quarter of 2011." And those were the two—I guess two areas that had statements that I would, you know, reflect [that] … this company has significant revenue potential and their product should be coming to market or almost immediately.

Tr. Jan. 28 at 30:10–31:8 (testimony of Hunter).

At trial, the Court admitted the VRP Overview only for the limited purpose of establishing that Hunter received the VRP Overview and that Hunter understood that the VRP Overview had been created by Martin.[38] This ruling was based upon the absence of evidence showing either that Martin had created the VRP Overview or that Martin knew that Shohet had sent the VRP Overview to Hunter to solicit funds for VRP. Later in the trial, Martin admitted that he prepared the VRP Overview with the assistance of others.[39] Martin further testified that Shohet was heavily involved in the process of soliciting funds for VRP:

> George [Shohet] had already started taking me out and introducing me to other venture capital. We had, you know, a specific meeting with a VC in Santa Monica that had experience investing in the music—disruptive music space and so, you know, I was very optimistic and that's when he said he was going to get Mr. Hunter to invest.

Tr. Feb. 4 at 192:25–193:5 (testimony of Martin).

Martin's testimony shows that at the time of the communications between Shohet and Hunter, Shohet was actively soliciting funding for VRP on Martin's behalf. Based upon this relationship between Martin and Shohet, the Court finds that the VRP Investment Materials that Shohet sent to Hunter had been provided by Martin, and that Martin intended for Shohet to use the VRP Investment Materials to pitch VRP to potential investors and lenders. Martin's contention that he did not intend for Shohet to use the VRP Investment Materials in this manner is simply not plausible.[40] In view of this finding, the Court will not limit the scope of the admissibility of the VRP Overview or the VRP Investment Materials.

---

[37] Plaintiff's Ex. 2.

[38] Tr. Jan. 28 at 29:22–25.

[39] Tr. Feb. 4 at 100:12–18.

[40] *See* Tr. Feb. 4 at 200:8–11 ("I wasn't under the impression that these numbers went out to Mr. Hunter in regards to making an investment") (testimony of Martin).

The most significant factor motivating Hunter's decision to extend the loan to Martin was that Shohet had vouched for Martin and that Shohet was working with VRP. Hunter testified:

> George [Shohet] came to me for short-term financing. I knew he was working with this company, that he would be involved. He had sent me these documents which I reviewed, showed the company through the projections obviously thought they had potential. I knew that that was—it was one indicator that, okay, it's here. It's something that the company is of interest, something that I can do due diligence on given the financials I've seen and the terms of the loan that I had some time to do that due diligence.
>
> I matched that with the term sheet, the stated value of the collateral, the fact that it was a short-term loan, the fact that George can vouch for Paul's integrity said, "Okay, I'll make the loan. It's collateralized."

Tr. Jan. 4 at 67:12–25.

Hunter did not perfect his security interest in the Porsche or the Artwork based upon Shohet's representations as to Martin's integrity. Hunter testified:

> No, I didn't [perfect my security interest]. And George [Shohet] and I discussed it. I said "Look, it's a short-term loan. You're working with the company. You've ask [sic] for Paul Martin's integrity. I don't want to hold his car as collateral for him. Is he trustworthy?" "Yes, he is," according to George. "Friendly deal. Let's move forward."

Tr. Jan. 4 at 78:25–79:5.

Hunter's actions subsequent to Martin's failure to repay the loan further establish that Hunter made the lending decision primarily because Shohet had vouched for Martin. The Note came due in November 2011.[41] Martin had made no payments. Hunter did not contact Martin to discuss the Note until 2014.[42] Instead, Hunter periodically asked Shohet about VRP and the status of the Note. Hunter was "a little uncomfortable,"[43] but was satisfied with Shohet's statements that Martin just needed more time to repay:

> Remember, this was a friendly deal. George [Shohet] is working with the company. He had vouched for the honesty and integrity of Paul [Martin], so I went with it. You know, I wanted to be supportive, I would say. But obviously at some point I would want my money back with a six percent nominal interest rate.

Tr. Jan. 4 at 87:8–14 (testimony of Hunter).

That Hunter placed only minimal reliance upon the VRP Investment Materials is also shown by Hunter's testimony that VRP was "a technology company that's in an area which I'm not familiar with at all" and that Hunter lacked time "to do any due diligence, real due diligence on this company."[44] That is, Hunter admitted that he lacked the expertise to assess VRP's business

---

[41] The Note initially came due in September 2011. Hunter agreed to Martin's request to extend the deadline by two months to November 2011.

[42] Tr. Jan. 28 at 86:23–87:3 (testimony of Hunter).

[43] Tr. Jan. 28 at 87:8 (testimony of Hunter).

[44] Tr. Jan. 28 at 21:4–7 (testimony of Hunter).

and did not have the time to do the work that would be necessary to gain such expertise. These admissions show that Hunter did not place substantial weight upon the VRP Investment Materials in making the lending decision.

VRP did not achieve the financial projections set forth in the VRP Investment Materials. However, the projections were not unreasonable as of August 2010, when they were presented to Hunter. This finding is based upon the testimony of Edward Hunter Williams ("Williams"), which the Court found to be especially credible, given that Williams has no financial stake in the outcome of this litigation. As of 2010, Williams was the Senior Vice President of Strategic Development and Royalty Distribution at SESAC.[45] SESAC is a performing rights organization that licenses the public performances of songs on behalf of composers and music publishers.[46] Williams' responsibilities at SESAC included assessing the impact of new technologies on the music licensing business.[47] Williams was familiar with VRP's technology because SESAC had entered into an agreement to invest $150,000 in VRP.[48]

Williams testified that the financial projections set forth in the VRP Investment Materials were "not unrealistic numbers for the type of industry that we [are] in,"[49] considering that VRP's business had the potential to "scale very quickly, very easily."[50] He testified that VRP's "technology was there"[51] and that the "business plan was very real to us."[52] In Williams' view, VRP failed to achieve the financial projections because its technology "was ahead of its time":

> It—not to digress or get sidetracked, but I think it's relevant to the relationship with Mr. Martin is that, you know, when I first met him he was talking about things that the industry is just now—and I'm not trying to set him up as some savant or, you know, whatever, but he was truly talking about things that the world is just now starting to realize, starting to really seriously consider….
>
> [The] [t]echnology was there. It's just—it's like a lot of products that are launched. The ideas, the technology. It works, but there's more to it. You know, there has to be other things to—for it to really fly. And it was close.

Tr. Jan. 28 at 196:19–197:11.

In 2015, Martin sold the Porsche to a mechanic for $10,000.[53] Martin did not inform Hunter of the sale or remit any of the sale proceeds to Hunter.[54] Martin sold the Porsche because the engine required major repairs that Martin could not afford to have completed.[55]

---

[45] SESAC was originally known as the "Society of European Stage Authors and Composers." The organization no longer uses its full name and is now known only as SESAC.
[46] Tr. Jan. 28 at 173:12–19 (testimony of Williams).
[47] Tr. Jan. 28 at 182:13–19 (testimony of Williams).
[48] Tr. Jan. 28 at 188:2–7 and Plaintiff's Ex. 18.
[49] Tr. Jan. 28 at 182:23–24 (testimony of Williams).
[50] Tr. Jan. 28 at 182:19–20 (testimony of Williams).
[51] Tr. Jan. 28 at 187:4–5 (testimony of Williams).
[52] Tr. Jan. 28 at 187:4 (testimony of Williams).
[53] Tr. Feb. 4 at 205:2–5 (testimony of Martin).
[54] Tr. Feb. 4 at 205:12–15 (testimony of Martin).
[55] Tr. Feb. 4 at 205:2–11 (testimony of Martin).

## III. Discussion

### A. Section 523(a)(2)(A)—False Pretenses or False Representations

Section 523(a)(2)(A) provides: "A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To except debts from discharge, a creditor has the burden of proof under the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654 (1991).

Statements respecting the debtor's or an insider's financial condition are governed by the heightened standard set forth in § 523(a)(2)(B). *See Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1763–64, 201 L. Ed. 2d 102 (2018) (explaining the structure and legislative history of § 523(a)(2)). A "statement is 'respecting' a debtor's financial condition if it has a direct relation to or impact on the debtor's overall financial status." *Lamar*, 138 S.Ct. at 1761. Such statements can include statements pertaining to a single asset. A "single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.*

Martin's representations can be grouped into two categories: representations regarding VRP's business potential and representations regarding the value of the Collateral. Representations regarding VRP's business potential do not qualify as statements respecting Martin's financial condition. Although Martin held an interest in VRP, other investors did as well. VRP's performance undoubtedly had the potential to have some effect on Martin's financial condition, but since Martin was not the sole owner of VRP, that effect was too attenuated for Martin's statements regarding VRP to qualify as statements respecting Martin's financial condition.[56] In contrast, Martin's statements regarding the value of the Collateral— which Martin owned free and clear—do qualify as statements respecting Martin's financial condition.

To prevail on a § 523(a)(2)(A) claim on the grounds of false pretenses or false representation, a creditor must prove that:

> (1) the debtor made the representations;
> (2) that at the time he knew they were false;
> (3) that he made them with the intention and purpose of deceiving the
>     creditor;
> (4) that the creditor relied on such representations; and
> (5) that the creditor sustained the alleged loss and damage as the
>     proximate result of the misrepresentations having been made.

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

---

[56] Even if Martin's representations regarding VRP were statements respecting Martin's financial condition, the Court's ultimate conclusion (explained below) that such representations do not give rise to non-dischargeable indebtedness would remain unchanged. The standard imposed by § 523(a)(2)(B) is more difficult to satisfy than the standard imposed by § 523(a)(2)(A). Therefore, Hunter's failure to demonstrate non-dischargeability under § 523(a)(2)(A) means that Hunter could not demonstrate non-dischargeability under § 523(a)(2)(B).

Martin's representations regarding VRP's business potential were not false at the time they were made. Williams' testimony established that the financial projections set forth in the VRP Investment Materials were not unreasonable when presented to Hunter in August 2010. The fact that VRP, like many start-up companies, did not achieve its ambitions does not show that the projections were false or misleading. As Williams testified, VRP failed because its technology was "ahead of its time."[57]

The determination that the VRP Investment Materials were not false or misleading must also take into account that the materials were projections describing a fast-moving start-up enterprise. As a sophisticated investor, Hunter understood that it was necessary to approach the projections with a degree of caution. Hunter's own testimony acknowledged this reality: "I did note that they [VRP] missed the milestone of actually bringing the product to market in the fall, you know, but these things are somewhat in flux."[58] Like nearly all investor presentations, the projections reflected an aggressively optimistic view of VRP's future. But Hunter, whose job is to assess investment opportunities, knew that. In hindsight, the gap between VRP's failure and the $50 million gross revenue projected by 2015 appears striking. However, when considering the context in which they were made, even such aggressively optimistic projections do not qualify as false or misleading.

Hunter did not rely primarily upon the representations contained in the VRP Investment Materials when making the lending decision, which is also fatal to Hunter's § 523(a)(2)(A) claim. Under § 523(a)(2)(A), a debt is not excepted from discharge unless the creditor justifiably relies upon the debtor's representation. *Field v. Mans*, 516 U.S. 59, 77, 116 S. Ct. 437, 447, 133 L. Ed. 2d 351 (1995). As discussed above, the most significant factor motivating Hunter's decision to extend the loan to Martin was that Shohet had vouched for Martin and that Shohet was working with VRP. Hunter reviewed the VRP Investment Materials, but did not place substantial weight upon them when making the lending decision. Therefore, Hunter did not justifiably rely upon the VRP Investment Materials.

Hunter contends that the Note's option for Hunter to convert his loan into an equity interest in VRP amounts to a false representation under § 523(a)(2)(A). Hunter's theory is that it would have been impossible for him to exercise the conversion option, because VRP had not issued a sufficient number of shares to accommodate Hunter in the event he elected conversion. Hunter's argument lacks merit. As a result of a typographical error, VRP issued only 100,000 shares of stock, when it had intended to issue 100 million shares.[59] The error was not intentional and could have easily been corrected had Hunter actually been interested in exercising his conversion option.

**B. Section 523(a)(2)(A)—Actual Fraud**

A creditor may also prevail on a § 523(a)(2)(A) claim on the ground of "actual fraud." "Actual fraud" includes "a fraudulent conveyance of property made to evade payment to creditors." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1585, 194 L. Ed. 2d 655 (2016). Such fraudulent conveyance schemes fall within the ambit of § 523(a)(2)(A) even when they do not involve a false representation or are carried out subsequent to the credit transaction that created the debt. *See Husky*, 136 S.Ct. at 1589–90 (holding that § 523(a)(2)(A) does not require that the

---

[57] Tr. Jan. 28 at 196:19–20.
[58] Tr. Jan. 28 at 80:7–9 (testimony of Hunter).
[59] Tr. Jan. 28 at 161:22–162:1 (testimony of Shohet).

relevant debt "result from fraud *at the inception of a credit transaction*") (emphasis in original); *id.* at 1590 ("[W]e interpret 'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation").

As stated by the Supreme Court in *Husky*:

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586, 194 L. Ed. 2d 655 (2016) (internal citations omitted).

A fraudulent conveyance constitutes "actual fraud" for purposes of § 523(a)(2)(A) if the purpose of the conveyance is to conceal assets from a creditor or hinder the creditor's ability to collect a debt. *Husky*, 136 S. Ct. 1581, 1587, 194 L. Ed. 2d 655 (2016).

In 2015, Martin sold the Porsche to a mechanic for $10,000, even though Martin knew that the Porsche was collateral for the Note. Martin did not inform Hunter of the sale or remit any of the sale proceeds to Hunter. This conduct qualifies as "actual fraud." It was wrong for Martin to sell the Porsche without remitting the sales proceeds to Hunter. Martin was aware that the Porsche was Hunter's collateral, and thus knew that the unauthorized sale was wrong. By disposing of Hunter's collateral without authorization, the sale hindered Hunter's ability to collect upon the Note.

## C. Section 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge indebtedness obtained through use of a statement in writing:

    i.    that is materially false;
    ii.    respecting the debtor's or an insider's financial condition;
    iii.    on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
    iv.    that the debtor caused to be made or published with intent to deceive....

§ 523(a)(2)(B).

To prevail upon a claim under § 523(a)(2)(B), a creditor must satisfy, by a preponderance of the evidence, the following requirements:

    (1) a representation of fact by the debtor,
    (2) that was material,
    (3) that the debtor knew at the time to be false,
    (4) that the debtor made with the intention of deceiving the creditor,
    (5) upon which the creditor relied,
    (6) that the creditor's reliance was reasonable,
    (7) that damage proximately resulted from the representation.

*In re Candland*, 90 F.3d 1466, 1469 (9th Cir. 1996), as amended (Oct. 2, 1996).

The requirements are similar to those imposed by § 523(a)(2)(A), except that the creditor must make a heightened showing in two respects: (1) the representation at issue must be *materially* false (as opposed to simply false), and (2) the creditor's reliance must be *reasonable* (as opposed to justifiable).

A statement is "materially false if it includes information which is 'substantially inaccurate' and is of the type that would affect the creditor's decision making process. To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths." *Candland*, 90 F.3d at 1470.

Hunter's § 523(a)(2)(B) claim fails because he failed to show, by a preponderance of the evidence, that (1) Martin's claims regarding the value of the Collateral were materially false when made, or that (2) Martin intended to deceive Hunter with respect to the Collateral's value.

First, Hunter presented no evidence establishing the value of the Collateral as of August 2010, when Martin represented that the Collateral's value exceeded $50,000. Martin testified that he sold the Porsche to a mechanic for $10,000 in 2015 after the engine stopped working. This testimony sheds no light on the Porsche's value as of August 2010. Martin was using the Porsche as his daily driver in New York City subsequent to August 2010, which would have caused its value to depreciate.

Martin testified that as of the present time, one of the two paintings would be worth $3,500, but only after receiving rehabilitation costing between $2,000 to $3,000.[60] Martin testified that the other painting likely had no value because it had decayed as a result of exposure to the salt and air in his seaside apartment.[61] Martin's testimony did not indicate precisely when either painting began to deteriorate or what the paintings were worth as of August 2010. Martin's testimony does little to establish the value of the paintings at the time of execution of the Note.

Without presenting evidence as to what the Collateral was worth as of August 2010, Hunter cannot carry his burden of showing that Martin's claimed valuation as of that date was materially false.

Second, Hunter has failed to establish that Martin intended to deceive Hunter with respect to the Collateral's value. As discussed above, in August 2010, Martin represented that the Porsche and both paintings were collectively worth more than $50,000. Testimony at trial did not clearly elucidate exactly how Martin derived this valuation. It appears that the portion of the valuation attributable to the paintings was Martin's estimate, informed by Martin's understanding that the artist had sold a different painting for $30,000.[62] Martin plausibly testified that he did not have the qualifications to value art.[63] The Court finds that the $50,000 valuation of the Collateral was Martin's unsophisticated estimate, but that Martin did not present this valuation with the intent to deceive Hunter.

## D. Section 523(a)(4)

Section 523(a)(4) excepts from discharge "any debt for fraud or defalcation while acting in a fiduciary capacity." "To prevail on a nondischargeability claim under § 523(a)(4) the plaintiff

---

[60] Tr. Feb. 4 at 207:10–19 (testimony of Martin).
[61] Tr. Jan. 28 at 206:18–207:5 (testimony of Martin).
[62] Tr. Feb. 4 at 207:16–19 (testimony of Martin).
[63] Tr. Feb. 4 at 206:23 (testimony of Martin).

must prove not only the debtor's fraud or defalcation, but also that the debtor was acting in a fiduciary capacity when the debtor committed the fraud or defalcation." *In re Honkanen*, 446 B.R. 373, 378 (B.A.P. 9th Cir. 2011).

Federal bankruptcy law determines whether a fiduciary relationship exists within the meaning of §523(a)(4). *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2003). For purposes of §523(a)(4), the fiduciary relationship "must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt." *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996). State law determines whether the requisite trust relationship exists. *In re Mele*, 501 B.R. 357, 363 (B.A.P. 9th Cir. 2013).

Hunter's § 523(a)(4) claim fails because no fiduciary relationship existed between Hunter and Martin. Martin and Hunter conducted no business prior to execution of the Note. The parties' business relationship was limited to Hunter's extension of credit to Martin through the Note. Hunter's act of extending credit did not create an express or technical trust under California law.

## E. Section 523(a)(6)

"Section 523(a)(6) excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and 'malicious' requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 463 (9th Cir. B.A.P. 2015) (internal citations omitted).

An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 463 (internal citations omitted). An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) (internal citations omitted).

In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under §523(a)(6). *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008). "[C]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Id.* at 1041.

None of Martin's conduct qualifies as "willful" and "malicious" within the meaning of § 523(a)(6). Martin did not solicit the loan with the intent of injuring Hunter. Martin genuinely believed that VRP would be a success and that he would be able to repay the proceeds. Martin's decision to sell the Porsche and retain the proceeds, all without telling Hunter, was wrongful, but does not qualify as a deliberate and intentional injury. Martin did not sell the Porsche for the purpose of injuring Hunter; he sold the Porsche because he could no longer afford the expensive engine repairs the car required.

## F. Damages

As a result of the "actual fraud" that Martin committed by selling the Porsche and failing to remit the sales proceeds to Hunter, Hunter was damaged in the amount of $10,000. Martin's unauthorized sale prevented Hunter from foreclosing upon the Porsche and applying its value toward repayment of the Note. The only evidence of the Porsche's value at the time of the sale was Martin's testimony that the sale price was $10,000.

Hunter seeks an award of attorney's fees. The Note contains the following provision with respect to attorney's fees:

> Borrower shall pay all costs and expenses, including, without limitation, reasonable attorneys' fees and expenses Lender expends or incurs in connection with the enforcement of this Note, the collection of any sums due hereunder, any actions for declaratory relief in any way related to this Note, or the protection or preservation of any rights of the holder hereunder.

Note at ¶ S (Plaintiff's Ex. 16).

"No general right to attorney fees exists under the Bankruptcy Code. However, a prevailing party in a bankruptcy proceeding may be entitled to an award of attorney fees in accordance with applicable state law if state law governs the substantive issues raised in the proceedings." *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441 (9th Cir. 1997). The applicable provisions of California law governing the award of attorney's fees are Cal. Civ. Code § 1717(a) and Cal. Code Civ. Proc. § 1021.

Cal. Civ. Code § 1717(a) provides in relevant part:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717(a) applies only to attorney's fees incurred in actions involving a contract claim. *Santisas v. Goodin*, 17 Cal.4th 599, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998). A non-dischargeability claim based on actual fraud is not a contract claim. *Redwood Theaters v. Davison (In re Davison)*, 289 B.R. 716, 724 (B.A.P. 9th Cir. 2003). Hunter is not entitled to attorney's fees pursuant to Cal. Civ. Code § 1717(a).

Cal. Code Civ. Proc. § 1021 provides in relevant part:

> Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided.

Cal. Code Civ. Proc. § 1021 does not limit the recovery of attorney's fees to certain claims. *3250 Wilshire Boulevard Bldg. v. W.R. Grace & Co.*, 990 F.2d 487, 489 (9th Cir. 1993). Fees may be recoverable under Cal. Code Civ. Proc. § 1021 even if not recoverable under Cal. Civ. Code § 1717(a). *Id.* "Section 1021 allows the parties to agree that the prevailing party in litigation may recover attorney's fees, whether the litigation sounds in contract or in tort." *Taburaza v. Zarate (In re Zarate)*, 567 B.R. 176, 182 (Bankr. N.D. Cal. 2017). "To determine whether a prevailing party may recover attorney's fees for non-contractual claims under Section 1021, a court must look to the language of the agreement." *Terra Nova Industries, Inc. v. Chen (In re Chen)*, 345 B.R. 197, 201 (N.D. Cal. 2006).

Fee provisions limited to the enforcement of the terms of the contract or to the collection of monies owed under the contract have been held not to extend to fees incurred in litigating tort claims, such as the instant non-dischargeability action. *See, e.g., Exxess Electronixx v. Heger Realty Corp.*, 64 Cal.App.4th 698, 707–708, 75 Cal.Rptr.2d 376 (1998) (an action or proceeding to "enforce the terms or declare rights" under a lease did not cover tort claims); *Sharma v. Salcido (In re Sharma)*, 2013 WL 1987351, *18 (9th Cir. B.A.P. 2013) (suit to "enforce or interpret" a settlement agreement did not cover fees in a § 523(a)(2)(A) case involving fraud in inducement of settlement agreement). In contrast, provisions with broader language—suits arising from or with respect to the subject matter or enforcement of a contract—have been held to extend to fees incurred in litigating tort claims. *See, e.g., 3250 Wilshire Blvd. Building v. W.R. Grace & Co.*, 990 F.2d 487, 489 (9th Cir. 1993) (contract providing for fees for any suit with respect to "the subject matter or enforcement" of contract covered tort claims); *Santisas v. Goodin*, 17 Cal.4th 599, 608, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998) (agreement for fees for any "litigation arising out of the execution" of agreement or sale of property covered tort claims); *Xuereb v. Marcus & Millichap, Inc.*, 3 Cal.App.4th 1338, 1341, 5 Cal.Rptr.2d 154 (1992) (agreement providing for prevailing party fees in "any lawsuit or other legal proceeding to which it gives rise" covered tort claims including events that occurred prior to agreement's formation).

The Note's fee provision provides for the recovery of fees incurred "in connection with the enforcement of this Note" or in "the collection of any sums due hereunder." Consistent with the authorities cited above, these provisions do not extend to fees incurred in the litigation of the instant dischargeability action. The Note provides for a recovery of fees incurred in an action "for declaratory relief in any way related to this Note." This dischargeability action is not an action for declaratory relief.

Finally, the Note provides for the recovery of fees incurred in connection with "the protection or preservation of any rights of the holder hereunder." This language is sufficiently broad to encompass the instant dischargeability action. The language is similar to provisions allowing recovery for fees incurred with respect to suits arising from or with respect to the subject matter of a contract; such provisions have been held to extend to tort claims.

Hunter is entitled to an award of attorney's fees incurred in connection with establishing Martin's liability for "actual fraud" on account of the unauthorized sale of the Porsche. Hunter is not entitled to attorney's fees incurred in presenting other aspects of his case against Martin. By separate order, the Court will set deadlines for Hunter to submit evidence establishing the fees incurred in connection with his § 523(a)(2)(A) claim for "actual fraud."

## III. Conclusion

Based upon the foregoing, Martin is indebted to Hunter in the amount of $10,000. Such indebtedness is excepted from Martin's discharge pursuant to § 523(a)(2)(A), on the ground of "actual fraud." The Court will not enter final judgment until the issue of Hunter's attorney's fees has been determined.

###

Date: July 10, 2019

Ernest M. Robles
United States Bankruptcy Judge